# THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MONTANA
# GREAT FALLS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                      Plaintiff,<br><br>vs.<br><br>DOUGLAS AXL DAHL,<br><br>                      Defendant. | CR-25-57-GF-BMM<br><br>**ORDER ON<br>MOTION TO DISMISS** |

      A federal grand jury indicted Douglas Axl Dahl ("Dahl") on one count of being a prohibited person in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(3) and forfeiture in accordance with 18 U.S.C. § 924(d). (Doc. 1.) Dahl moved to dismiss the charges contained in the Indictment. (Doc. 24.) Dahl is currently released on conditions. (Doc. 23.) The Court held a hearing on the motion to dismiss on December 4, 2025. (Doc. 41.)

## BACKGROUND

      Great Falls law enforcement responded to a disturbance in the 500 block of 5th Ave South on December 1, 2023. (Doc. 26 at 2.) A woman allegedly questioned Dahl on why he had been parked outside her home. (*Id.*) The woman also questioned Dahl on his alleged drug activity. (*Id.*) Dahl allegedly responded "get out of my face" and "this is a public road" before attempting to push her. (*Id.*) Another person

1

approached the residence. (*Id.* at 3.) Dahl then allegedly pointed a firearm at the woman, stating that he would "blow her brains out" if he got in trouble for drugs. (*Id.*)

Law enforcement later observed Dahl leaving a nearby residence. (*Id.*) Dahl admitted to law enforcement that he had a pistol in his pocket upon questioning. (*Id.*) Dahl denied taking out the pistol and pointing it at the woman. (*Id.*) Dahl admitted that the woman had confronted him. (*Id.*) Dahl further claimed that he told the woman that he had a gun and to leave him alone as another person had approached the scene. (*Id.*) Dahl initially told law enforcement that he left the pistol with his brother. (*Id.*) Dahl eventually showed law enforcement where he had abandoned the pistol. (*Id.*) Law enforcement retrieved the pistol and arrested Dahl. (*Id.*) Law enforcement decided to impound Dahl's car upon noticing a pistol magazine and drug paraphernalia inside the car. (*Id.*)

Law enforcement conducted a search of Dahl's car on December 4, 2023. (Doc. 26 at 3; Doc. 34 at 4.) Law enforcement found a pistol magazine, pistol holster, ammunition, a suspected fentanyl pill, and a piece of burnt tin foil on the front passenger floorboard of the car. (Doc. 26 at 3–4.) The tin foil later tested positive for fentanyl. (Doc. 26 at 4; Doc. 34 at 4.)

Dahl later admitted to having used about 15 fentanyl pills daily during an interview with an ATF Special Agent and a Great Falls Police Detective. (Doc. 26

at 4; Doc. 34 at 3.) Dahl also admitted to using methamphetamine on occasion. (*Id.*) Dahl later reported to having reduced his fentanyl usage to about five to ten pills daily. (*Id.*) Dahl alleges that he purchased some pills during the week of the firearm seizure. (*Id.*) Dahl further alleges that he had difficulties in locating the pills the night before law enforcement seized the firearm from him. (*Id.*) Dahl admits to having suffered withdrawals while in custody. (Doc. 34 at 4.)

The Court ordered the parties to submit supplemental briefing on Dahl's motion to dismiss on October 21, 2025. (Doc. 33.) The Court instructed the parties to file supplemental briefing focusing on Dahl's as applied challenge using the factors outlined in *United States v. Harris*, 144 F.4th 154 (3d Cir. 2025). (*Id.*)

## LEGAL STANDARD

Rule 7(c) of the Federal Rules of Criminal Procedure requires that an indictment contain a "plain, concise and definite written statement of the essential facts constituting the offense charged." F. R. Crim. P. 7(c)(1). An indictment that contains the following information complies with Rule 7(c): (1) alleges each element of the crime charged, *United States v. Awad*, 551 F.3d 930, 935 (9th Cir. 2009); and (2) sets forth the essential facts necessary to inform the defendant of what he is charged, *United States v. Blinder*, 10 F.3d 1468, 1476 (9th Cir. 1993).

These requirements ensure that the defendant possesses sufficient information to prepare a defense and plead double jeopardy if charged in a different case. *Awad*,

551 F.3d at 935. An indictment that "tracks the words of the statute charging the offense is sufficient so long as the words unambiguously set forth all elements necessary to constitute the offense." *United States v. Givens*, 767 F.2d 574, 584 (9th Cir. 1985). The indictment is to "be read in its entirety, construed according to common sense, and interpreted to include facts which are necessarily implied." *Id*.

## DISCUSSION

The parties agree that *United States v. Stennerson*, 150 F.4th 1276, 1285 (9th Cir. 2025), foreclosed Dahl's original facial challenge to § 922(g)(3). Dahl now challenges § 922(g)(3) as applied to him. Section 922(g)(3) prohibits persons who are unlawful users of or who are addicted to a controlled substance from "receiv[ing] any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." 18 U.S.C. § 922(g)(3).

Dahl submitted briefing addressing the *Harris* factors. (Doc. 34.) The Government responded and briefly addressed the *Harris* factors but primarily argued that the Court must apply Ninth Circuit precedent. (Doc. 39.) The Government contends that *Harris* conflicts with Ninth Circuit jurisprudence, including *United States v. Duarte*, 137 F.4th 743 (9th Cir. 2025) and *United States v. Stennerson*, 150 F.4th 1276, 1285 (2025). (*Id.*) The Court will address each argument.

### I. History & Tradition

The Second Amendment guarantees that "the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. No question exists that § 922(g)(3) implicates the ability "to keep and bear Arms" as § 922(g)(3) places a categorical ban on possession of firearms. *New York State Rifle & Pistol Ass'n*, *Inc. v. Bruen*, 597 U.S. 1, 32 (2022). The Government must overcome the presumption that Dahl's possession of firearms is constitutionally protected as the Second Amendment applies. *Stennerson*, 150 F.4th at 1282. The Government must establish that our "historical tradition of firearm regulation" supports § 922(g)(3)'s restriction on gun possession by users of illegal drugs. *Id*. (citing *Bruen*, 597 U.S. at 24). Modern laws pass this test if they are "'relevantly similar' to laws that our tradition is understood to permit," especially in "[w]hy and how [they] burden the right." *United States v. Rahimi*, 602 U.S. 680, 692 (2024) (quoting *Bruen*, 597 U.S. at 29). Though our Second Amendment law looks to history and tradition, it is not "trapped in amber." *Rahimi*, 602 U.S. at 691. Modern regulations must rest on historical "principles" but need not be a "historical twin." *Id*. at 692.

*Stennerson* concluded that "our nation's tradition of firearms regulation at least supports restricting possession of firearms by those who are presently intoxicated and, therefore, hindered in their ability to exercise sound judgment and self-control." 150 F.4th at 1285. The Ninth Circuit determined that "the restriction that [§ 922(g)(3)] imposes 'is consistent with the Nation's historical tradition of

firearm regulation'" because it is facially constitutional at least in those circumstances. *Id.* (quoting *Bruen*, 597 U.S. at 24). The Fifth and Eighth Circuits have reached the same conclusion. *See United States v. Connelly*, 117 F.4th 269, 282 (5th Cir. 2024); *see also United States v. Veasley*, 98 F.4th 906, 918 (8th Cir.), *cert. denied*, 145 S. Ct. 304 (2024). The Court faces the question of whether these same historical analogs also support § 922(g)(3)'s restriction on gun possession as applied to Dahl.

The Government argues that the Court need look no farther than *Duarte*. (Doc. 39 at 2–3.) *Duarte* concluded that § 922(g)(1) constitutionally may apply to the category including all felons because "legislatures may categorically disarm those they deem dangerous, without an individualized determination of dangerousness." *Duarte*, 137 F.4th at 755. The Government argues that this same logic can be applied here as *Duarte* obviates the need for an individualized assessment of dangerousness for each person in a class of prohibited persons. (Doc. 39 at 3.)

The Government cites several examples of historical bans that categorically prohibited classes of people from possessing firearms. (*Id.* at 3–4.) These historical examples reflect prejudicial and racially discriminatory animus, including bans on "Catholics, non-Anglican Protestants, Native Americans, slaves or freed Black people, and those who refused to swear loyalty oaths." (*Id.* at 4, citing *Duarte*, 137 F.4th at 759–60.) *Rahimi* instructs us to evaluate whether a class of people pose a

6

"special danger of misuse." 602 U.S. at 682. *Duarte* acknowledges that these categorical bans may represent examples of abhorrent prejudices, but they also provide proof that legislatures considered overbroad, categorical disarmaments appropriate throughout history even when they swept-in "law-abiding people who were not dangerous, violent, untrustworthy, or unstable." 137 F.4th at 761 (quoting *Range v. Att'y Gen. United States*, 124 F.4th 218, 267 (3d Cir. 2024) (Krause, J. concurring). The Court does not fully grasp how *Duarte* properly expands *Rahimi*, yet it unquestionably does, and the Court remains bound by that holding.

*Duarte* seems to suggest that any categorical ban may be constitutional if the legislature imposed the ban upon a class of people it perceived to be dangerous. The Government provides a collection of evidence to demonstrate that Congress enacted § 922(g)(3) as a broad effort to "keep firearms away" from certain groups of people "classified as potentially irresponsible and dangerous." (Doc. 39 at 4, citing *Barrett v. United States*, 423 U.S. 212, 218 (1976) and *Lewis v. United States*, 445 U.S. 55, 64 (1980).) Congressional debate on the ban included discussion about how "[n]o one can dispute the need to prevent drug addicts . . . from buying, owning, or possessing firearms" in order to "reduc[e] the danger of crime" and protect society from "firearms misuse." (Doc. 39 at 5, citing *Huddleston v. United States*, 415 U.S. 814, 828 (1974) (quoting 114 CONG. REC. 21784 (1968) (statement of Rep. Emanuel Celler) and *United States v. Yancey*, 621 F.3d 681, 683–84 (7th Cir. 2010).)

Ample evidence exists that Congress perceived unlawful drug users to present a "special danger of misuse" for firearm possession.

*Duarte* and *Stennerson* do not excplicitly foreclose an as applied challenge to § 922(g)(3), yet the decisions functionally prevent the success of an as applied challenge to these provisions. *Duarte* and *Stennerson* conclude that it falls within our history and tradition to impose categorical disarmaments on groups deemed dangerous by the legislature. These holdings realistically limit as applied challenges to § 922(g) to claims that a defendant should not be considered as part of the group deemed dangerous. In other words, Ninth Circuit jurisprudence seems to suggest that the only potential as applied challenge by a person charged under § 922(g)(3) would be to argue that they do not qualify as a drug user under the statute. Dahl does not appear to be making such a challenge and Ninth Circuit precedent functionally forecloses any other as applied challenge.

*Stennerson* further concluded that our nation's tradition supports at least restricting possession of firearms by those who are presently intoxicated. 150 F.4th at 1285. Applying *Stennerson*'s holding to the facts of this case, § 922(g)(3) appears to be constitutional as applied to Dahl. The woman reported to law enforcement that she had approached Dahl sitting in his car outside her house for alleged drug activity. (Doc. 26 at 2.) Dahl admitted to law enforcement that the woman had at least confronted him. (*Id*. at 3.) Law enforcement discovered upon search of Dahl's car

8

one pill suspected to be fentanyl and a burnt piece of tinfoil containing pill residue. (*Id*. at 4.) The pill residue later tested positive for fentanyl. (*Id*.) Dahl later admitted to law enforcement that he regularly used between five to ten fentanyl pills daily. (*Id*.) Law enforcement failed to test Dahl for controlled substances. The available facts prove sufficient to preliminarily indicate that Dahl appeared intoxicated at the time regardless of the Government's failure to test Dahl for controlled substances upon his arrest.

The congressional record and caselaw also indicate that similar logic supports restricting possession of firearms for those people who are addicted to illegal drugs, regardless of whether they are presently intoxicated. Courts have cited studies that recognize the "connection between illegal stimulant use and violence as well as economically motivated violence by drug addicts." *Yancy*, 621 F.3d at 686. The principles and reasoning of *Stennerson*, *Duarte*, *Rahimi*, and *Bruen* demonstrate that § 922(g)(3) is constitutional as applied to Dahl. The Court will address the additional arguments made by the parties.

## II. Third Circuit Factors

The Court instructed the parties to submit supplemental briefing addressing the *Harris* factors as applied to Dahl. (Doc. 33.) The Third Circuit in *Harris* determined that "history and tradition justify § 922(g)(3)'s restrictions on those who pose a special danger of misusing firearms because they frequently use drugs."

*Harris*, 144 F.4th at 156. The Third Circuit remanded the case to the district court as it concluded that it lacked "enough facts to tell whether the law's restrictions [were] constitutional as applied to [the defendant.]" *Id*. The Third Circuit identified several, non-exhaustive factors for the district court to consider in assessing "how [the defendant's] drug use affected his mental state and riskiness." *Id*. at 165. The following factors would be relevant:

- The length and recency of the defendant's use during and shortly before his gun possession;
- The drug's half-life;
- Whether use of the drug affects a person's judgment, decision-making, attention, inhibition, or impulse control;
- Whether the drug may induce psychosis;
- The drug's interference with a user's perception of his own impairment; and
- The long-term physical and mental effects of the use of that drug.

*Id*. *Harris* instructs future courts confronting § 922(g)(3) challenges to consider these factors "in determining whether someone's drug use suggests that he 'likely poses an increased risk of physical danger to others if armed.'" *Id*. (quoting *Pitsilides v. Barr*, 128 F.4th 203, 212 (3d Cir. 2025)).

The Government argues that Ninth Circuit precedent directly conflicts with the type of individualized approach outlined in *Harris*. (Doc. 39 at 8.) The Government asserts that the en banc majority in *Duarte* "recognized that the historical analysis called for by the Supreme Court 'may allow greater regulation than would an approach that employs means-end scrutiny with respect to each

individual person who is regulated,' but that is merely 'the fruit of *Bruen*'s constitutional test.'" 137 F.4th at 762 (internal citation omitted).

The Government also contends that it would be inappropriate to conduct such a fact-based, individualized analysis pre-trial. (Doc. 39 at 9–10, citing Fed. R. Crim. P. 12(b)(3), *United States v. Pope*, 613 F.3d 1255, 1261–63 (10th Cir. 2010) (Gorsuch, J.), and *United States v. Grubb*, 135 F.4th 604 (8th Cir. 2025).) Dahl contends that the Court can appropriately make factual findings for the purposes of his as applied challenge through an evidentiary hearing like the common practice for hearings on motions to suppress. The Court remains troubled by the lack of procedural guidance as to this approach. The Third Circuit remanded the case in *Harris* to the district court to make factual findings on the factors, yet it provided no direction on how to develop the factual record.

Federal Rule of Criminal Procedure 12 governs pretrial motions in a criminal case. Rule 12(b)(1) provides that a party may raise by pretrial motion any defense that "the court can determine without a trial on the merits." Under Rule 12(d), the court must resolve every pretrial motion before trial "unless it finds good cause to defer a ruling" and deferral will not "adversely affect a party's right to appeal." *Grubb* discussed Rule 12 and the procedural issue associated with an as applied challenge requiring factual findings. 135 F.4th at 607. *Grubb* concluded that a "'trial on the merits' was [necessary] to decide [the defendant's] pretrial motion to dismiss

11

the indictment." *Id*. *Grubb* determined that "Rule 12 permits pretrial resolution of a motion to dismiss the indictment only when 'trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the defense.'" *Id*. (quoting *United States v. Pope*, 613 F.3d 1255, 1259 (10th Cir. 2010) (quoting *United States v. Covington*, 395 U.S. 57, 60 (1969)).

Pretrial resolution would be appropriate only when the parties have agreed to stipulated facts such that the factual evidence stands undisputed. Nothing requires the Government to present all the evidence in its case at this point in the litigation. *Grubb* reasoned that given the uncertain legal universe and the standards of Rule 12, "the government is entitled at this juncture to make a fulsome record on facts surrounding the commission of the offense and any other facts that may be relevant to resolving a constitutional challenge to § 922(g)(3)." *Grubb*, 135 F.4th at 608.

The Court finds persuasive the reasoning in *Grubb*. The Court also remains bound by *Duarte*, yet it will address the *Harris* factors to be thorough and avoid future litigation should the U.S. Supreme Court determine an individualized analysis would be required. The Court will run through each of the *Harris* factors in turn.

### a. The length and recency of the defendant's use during and shortly before his gun possession

Dahl contends that the Government fails to present evidence of the length and recency of Dahl's drug use "during and shortly before" possessing the firearm. (Doc. 34 at 3.) Dahl admits to using about five to ten fentanyl pills daily leading up to at

least some weeks before the week of alleged firearm possession. (*Id*.) Dahl further admits to having purchased a few fentanyl pills before the day of the alleged firearm possession. (*Id*.) Law enforcement failed to test Dahl for any controlled substances. (*Id*. at 4.) Dahl acknowledges a positive result for fentanyl in the test of the partial blue pill found in the burnt piece of tin foil from his car. (*Id*.) Dahl concedes to having experienced withdrawals while in custody following his arrest. (*Id*.)

### b. The drug's half-life

The elimination half-life of fentanyl is 3-4 hours, or 7-12 hours, and is administration dependent. (Doc. 34 at 5.)

### c. Whether use of the drug affects a person's judgment, decision-making, attention, inhibition, or impulse control and whether the drug may induce psychosis

The Drug Enforcement Agency identifies the following effects from fentanyl use: "relaxation, euphoria, pain relief, sedation, confusion, drowsiness, dizziness, nausea, vomiting, urinary retention, pupillary constriction, and respiratory depression." DEP'T OF JUSTICE, *Drug Fact Sheet*, (Oct. 2022) www.getsmartaboutdrugs.com. Dahl points out that "neither psychosis nor specific effects on judgment, decision-making, inhibition or impulse control are identified as effects on the body from fentanyl ingestion." (Doc. 34 at 6.)

### d. The drug's interference with a user's perception of his own impairment

Dahl argues that the Government presents no evidence on the degree to which fentanyl interferes with a user's perception of his own impairment. (*Id.* at 7.) Dahl acknowledges, however, that most substances interfere generally with a person's ability to perceive their own level of impairment. (*Id.*)

### e. The long-term physical and mental effects of the use of that drug

Dahl concedes that the long-term physical effects of opioid use are negative, but he asserts that the long-term mental effects are less obvious. (*Id.*)

### f. Conclusion on the *Harris* Factors

The Government presents limited argument on the specific application of the *Harris* factors to this case. The Court finds that the scant argument made by the parties provides sufficient information for a finding on § 922(g)(3)'s constitutionality as applied to Dahl. The available information indicates that Dahl had been struggling with heavy substance use leading up to his arrest. Dahl admitted to having used about ten to 15 fentanyl pills daily before having reduced his consumption to around five to ten fentanyl pills daily. It is both common sense and scientifically proven, that fentanyl presents some serious effects on a person's judgment, decision-making, attention, inhibition, and impulse control. Fentanyl interferes with a user's perception of his own impairment. Fentanyl also causes some form of long-term effects whether physical or mental. The *Harris* factors demonstrate that § 922(g)(3) is constitutional as applied to Dahl.

## CONCLUSION

The Court finds that § 922(g)(3) is constitutional as applied to Dahl based both on the reasoning and principles employed in *Stennerson* and *Duarte*, and on the *Harris* factors. Ample evidence exists in our nation's history and tradition of categorical bans on classes of people whom the legislature deemed dangerous. Congress considered people suffering from drug addiction to fall into a class of people who presented a "special danger of [firearm] misuse." *Harris*, 144 F.4th at 156. The Court denies Dahl's motion to dismiss the Indictment.

## ORDER

Accordingly, **IT IS ORDERED** that Dahl's Motion to Dismiss is **DENIED**.

DATED this 12th day of December, 2025.

_____
Brian Morris, Chief District Judge
United States District Court